**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**SECURITIES AND EXCHANGE COMMISSION,**

                              **Plaintiff,**

**v.**

**CITY OF MIAMI, FLORIDA AND**
**MICHAEL BOUDREAUX,**

                              **Defendants.**
_____/

**COMPLAINT**

Plaintiff Securities and Exchange Commission alleges as follows:

**I.    INTRODUCTION**

1.      The Commission brings this action to enjoin Defendants the City of Miami, Florida and its former Budget Director, Michael Boudreaux from violating the anti-fraud provisions of the federal securities laws.

2.      In March 2003, the Commission instituted a cease-and-desist order against the City for violations of the anti-fraud provisions of the federal securities laws in connection with bonds the City issued in 1995.  The City has gone on to violate these same provisions again – this time in connection with three bonds the City issued in 2009.

3.      The City raised approximately $153.5 million from the investing public through bond offerings in May, July, and December 2009.  In connection with these offerings, the City made numerous material misrepresentations and omissions to investors in the bond offering documents and the City's Comprehensive Annual Financial Reports ("CAFRs") concerning certain inter-fund transfers from its Capital Projects Funds to its General Fund, including transfers of restricted fees.

1

4.      Beginning no later than 2007 until 2009, the City engaged in a series of transfers from its Capital Projects Funds to its General Fund to mask the General Fund's deficits, transferred restricted funds into the General Fund, and falsely inflated the General Fund balance to achieve the City's goal of maintaining $100 million in reserves in its General Fund, and ultimately obtained more favorable ratings on its bond offerings.   To obtain the City Commission's approval of these inter-fund transfers, Boudreaux made misrepresentations to the City Commission about the transfers, which falsely represented that the project funds were unallocated, and concealed the transfers in the City's internal records.

5.      The City made numerous material misrepresentations and omissions to the investing public in its bond offering documents and 2007 and 2008 CAFRs about the inter-fund transfers.  For example, the City did not disclose the full amount or effect of the transfers to the General Fund's budget and its fund balance.  Further, the City represented the project funds transferred in 2007 and 2008 were "unexpended" or "unused," when in reality the funds were allocated to specific capital projects that still needed the money or had already spent it.  The City also failed to disclose it had not adjusted its Capital Projects Funds budget to reflect the transfers to the General Fund.

6.      Additionally, to ensure rating agencies gave the City's 2009 bond offerings favorable ratings, in April 2009 the City, through Boudreaux, made material misrepresentations and omissions to the agencies concerning the fiscal year 2007 and 2008 transfers and the City's projected operating deficit for its fiscal year 2009 General Fund.

7.      During the same time the Defendants were making material misrepresentations and omissions, the City obtained favorable ratings from the rating agencies on the more than $150 million the City raised from the investing public.  Notably, these favorable ratings allowed

the City to obtain the more than $150 million on more favorable terms than if they had less favorable ratings.  Ultimately, the true nature of the transfers was disclosed, many of the transfers were reversed, and the City's ratings were downgraded.

8.     In addition to the above misrepresentations and omissions, the City, through Boudreaux, engaged in other fraudulent and deceptive conduct in violation of the federal securities laws, including, but not limited to, misrepresenting the interfund transfers to the City Commission that approved the transfers and by taking affirmative steps to obscure or conceal the transfers in the City's internal records.

9.     By engaging in the conduct described above, and more fully below, the City has violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q; and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.  Boudreaux has violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q; Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5; and aided and abetted the City's violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.  Moreover, the Court should issue an order pursuant to Section 20(c) of the Securities Act and Section 21(e) of the Exchange Act commanding the City to comply with the prior Commission Order.

## II.    **DEFENDANTS**

### A.    **Defendants**

10.     The City is the largest municipality in Miami-Dade County, Florida in terms of population.  At all relevant times, a Mayor and the five member City Commission governed the City.   The highest ranking employee of the City is the City Manager, who reported to the

Mayor.  The City regularly issues municipal bonds to the public.  At the end of its most recent

fiscal year ending September 30, 2012, the City had outstanding municipal bonds (general

obligation, special obligation and revenue) totaling approximately $647 million.

11.     Boudreaux, 47, resides in New Orleans, Louisiana.  Boudreaux was the City's

Budget Director during the relevant time periods until his termination in March 2010.  In this

capacity, Boudreaux oversaw the Budget Department, which is responsible for the preparation

and presentation of the City's budgets for its general operating, capital projects, special revenue,

and debt service funds.  Boudreaux provided information used to draft sections of the City's

annual CAFRs, and he also provided budget information the City used in the CAFRs budget

schedules.  Boudreaux was also responsible for the City's Multi-Year Capital Plan – an official

statement of the City's long-range physical improvement plans.  In addition, he was responsible

for, among other things, preparing the overall capital budgets, updating the Multi-Year Capital

Plan, monitoring actual and non-operating capital project expenditures to ensure they did not

exceed budget appropriations, and reporting on the amount of those funds.  Moreover, the

transfers masterminded by Boudreaux were incorporated into the City's General Fund financial

information included in the City's Management Discussion and Analysis and financial

statements.

**B.      <u>Relevant Individuals</u>**

12.     During the relevant time period, the City employed a City Manager who had full

authority over the City's financial operations and the preparation of its annual budget.  He signed

a certificate stating the City's Official Statements for the 2009 bond offerings were free of

misstatements and omissions of material fact.  He also signed a transmittal letter assuming full

responsibility for the completeness and reliability of all information contained in the City's 2007 and 2008 CAFRs ("Transmittal Letters"). The City Manager resigned in February 2010.

13.     During the relevant time period, the City also employed a Chief Financial Officer ("CFO") who was responsible for oversight and management of all aspects of the City's finances, including its capital financing and bond issuance activities, budget development, and compliance with its codified Financial Integrity Principles. In February 2000, the City enacted the Financial Integrity Ordinance establishing thirteen financial integrity principles. The Financial Integrity Ordinance was enacted as a preventive measure setting forth financial practices that would prevent the recurrence of a financial emergency. He was also responsible for the City's Finance Department. The CFO also signed the Transmittal Letters. The CFO resigned from the City in June 2011.

14.     During the relevant time period, the City also employed a Finance Director who oversaw the Finance Department, which prepared the City's annual CAFRs. Together with the City Manager and CFO, the Finance Director also signed the Transmittal Letters. The Finance Director resigned from the City in September 2011.

## III.     **JURISDICTION AND VENUE**

15.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(c), 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(c), 77t(d)(1), and 77v(a); and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa.

16.     This Court has personal jurisdiction over the City and Boudreaux, and venue is proper in the Southern District of Florida because many of the acts, transactions, practices, and

courses of conduct constituting violations of the federal securities laws occurred in the Southern District of Florida and the City is located within the Southern District of Florida.

17.     In connection with the conduct alleged in this Complaint, the City and Boudreaux, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

## IV.     FACTUAL ALLEGATIONS

### A.     The Deteriorating Financial Condition of the City's General Fund

18.     The General Fund is used to account for all financial resources except those required to be reported in another fund.  In other words, resources in a fund other than the General Fund are either (1) required to be used for the purpose of that fund or (2) intended by the government to be used for that purpose.  "Fund balance" simply means the difference between the fund's assets and its liabilities.

19.     The City's General Fund is the largest component (representing more than $500 million or approximately 70% during the relevant period) of the City's adopted consolidated operating budget.  The General Fund pays for most of the City's core services and its largest departments, including the police and fire departments.  Rating agencies and bond insurers give primary attention to the condition of the General Fund in assessing a municipality's financial condition.

20.     During fiscal years 2007 through 2010, the City reported decreasing General Fund balances, because of overspending, revenue underperformance and declines in property taxes due to the housing market correction.  Escalating pension and health care costs were also a

significant drain on the City's finances.  All of these factors materially impacted the health of the City's General Fund during the relevant time period.

B.     **The Bond Offerings and the CAFRs**

1.     **The 2007 and 2008 CAFRs**

21.     On July 22, 2008, the City distributed its 2007 CAFR to broad segments of the investing public, including investors in previously-issued City debt pursuant to continuing disclosure agreements.  The CAFR is a government entity's official annual report.  The City's 2007 CAFR contained a Management's Discussion and Analysis ("MD&A") section and the City's audited financial statements for the fiscal year ending September 30, 2007.  The CAFR also contained a transmittal letter stating that the CAFR "is complete and reliable in all material aspects."

22.     On March 26, 2009, the City distributed its 2008 CAFR to broad segments of the investing public, including investors in previously-issued City debt.  The 2008 CAFR also contained an MD&A section and the City's audited financial statements for the fiscal year ending September 30, 2008.  The 2008 CAFR also contained a transmittal letter making the same statements as in the prior year about the completeness and reliability of the information presented in the CAFR.

23.     Also, as in the prior year, the Finance Department relied on Boudreaux's budget reports to prepare the 2008 CAFR.  The City completed the CAFRs budget tables by "dropping in the numbers" from Boudreaux's reports.  Boudreaux provided information the City relied on in other sections addressing the General Fund financial and budgetary highlights, economic factors, and budget forecasts.  Boudreaux also helped draft certain sections of the CAFR, including a portion of the transmittal letter describing the City's economic condition and outlook.

## 2.    The May 2009 -- $51 Million Bond Offering

24.    On May 29, 2009, the City issued approximately $51 million in Limited Ad Valorem Tax Bonds to pay for the costs of certain homeland defense/neighborhood capital improvement projects.  These bonds are not insured.  The bonds are secured by certain pledged City ad valorem tax revenues.  The Preliminary Official Statement and Official Statement for this bond offering contained, among other things, excerpts of the City's 2008 CAFR, including the MD&A section and fiscal year end 2008 audited financial statements.  The Official Statement also contained an "Authorization of Official Statement" stating the execution and delivery of the Official Statement was authorized by the City.  In addition, the bond closing documents contained a certificate stating the Official Statement was free of misstatements and omissions of material fact (the "Anti-Fraud Certification").

25.    The rating agency Standard and Poor's Financial Services LLC ("Standard and Poor's) gave this bond offering an "A" rating; the rating agency Moody's Investors Service, Inc. ("Moody's") gave it an "A3" rating; and the rating agency Fitch Ratings Ltd. ("Fitch") rated it an "A-".  These were favorable ratings for the City.  For example, obligations rated "A3" or "Aaa" by Moody's are judged to be of the highest quality by the rating agency and subject to the lowest level of credit risk.

26.    Rating agencies issue ratings on a scale from the best quality credit to the lowest.  Credit ratings are important because they affect the cost of borrowing, i.e., the interest rate the issuer will pay the investor for buying the bonds.  An issuer such as the City can save or incur significant additional costs in interest over the life of a bond because of its credit rating.  Issuers with good credit ratings are able borrow at low cost as they pay low interest rates.

### 3.     <u>The July 2009 -- $37 Million Bond Offering</u>

27.    On July 16, 2009, the City issued approximately $37 million in Non Ad Valorem Revenue Refunding Taxable Pension Bonds to raise funds to refund outstanding City bonds issued in 2006.  These bonds are not insured. The bonds are secured by certain pledged funds. The Preliminary Official Statement and Official Statement for this bond offering also contained, among other things, excerpts of the City's 2008 CAFR, including the MD&A section and fiscal year ended September 30, 2008 audited financial statements.  This offering also included an Authorization of Official Statement and an Anti-Fraud Certification.  The rating agencies gave this offering favorable ratings.  For instance, Standard and Poor's gave this bond offering an "A" rating and Moody's gave it an "A3" rating.

### 4.     <u>The December 2009 -- $65 Million Bond Offering</u>

28.    On December 2, 2009, the City issued $65 million in Special Obligation Bonds to pay for the cost of acquiring, constructing, and improving certain roadways and streetscapes. Although these bonds are not insured, pledges of certain local gas and transportation taxes and parking surcharges secure them.  The preliminary Official Statement and Official Statement for this bond offering also contained, among other things, excerpts of the City's 2008 CAFR, including the MD&A section and fiscal year ended September 30, 2008 audited financial statements.  This offering also included an Authorization of Official Statement and an Anti-Fraud Certification.  The rating agencies gave this offering favorable ratings.  For example, Standard and Poor's rated this bond offering an "A-"; Moody's rated it "A3"; and Fitch rated it an "A-".

C.     **The City's Operating Budget and Approval Process for Inter-fund Transfers**

29.     Pursuant to both Florida and local laws, the City must incur expenditures based only on funding appropriations the City Commission approves.   Florida law also requires municipalities to adopt a balanced budget each fiscal year.   The City's annual operating budget (the "Operating Budget") serves as the foundation for the City's fiscal planning, control, and accountability.   The City Manager submits the Operating Budget to the City Commission and, if it approves, the City Commission enacts it.   The Operating Budget includes the City's budget for all governmental funds (except for the Capital Projects Funds which are budgeted for separately) and budget appropriations, including transfers between the City's funds.

30.     The City Commission may amend the City's Operating Budget if, during the course of the year, it becomes evident that a particular department is unable to provide the required level of services to the community due to unexpected higher costs of providing that service.   In such instances, the City's Budget Director submits a resolution for the City Commission's approval.   Generally, the resolution includes a proposal for financing the additional expenditures, usually through either the appropriation of funds from the City's General Fund, or the submission of evidence of an expected surplus in current year revenue collections. The City Manager must approve the resolution before submitting it to the City Commission.

31.     The City's Budget for its Capital Projects Funds is detailed by project and funding source and is prepared as a part of a Multi-Year Capital Plan the City Commission authorizes and enacts.

32.     The City Commission must also approve inter-fund transfers.   Governmental Generally Accepted Accounting Principles ("GAAP") (in effect at the time) Statement 34 defines

11

inter-fund transfers as the flow of assets such as cash or goods from the fund making the transfer without equivalent flows of assets in return and without a requirement for repayment from the fund receiving the transfer.

33.    One of the City's financial goals was to maintain a total fund balance or total "reserve" of at least $100 million in the General Fund for fiscal years 2007 and 2008.  This $100 million reserve target for the General Fund was discussed at City Commission meetings on May 8, 2008, during which City officials, including Boudreaux, committed to keep the General Fund's balance at $100 million.  In addition, the $100 million reserve target for the General Fund was discussed at City Commission meetings on September 11, 2007 and September 11, 2008. The City recognized the importance of maintaining a healthy General Fund balance and considered the $100 million reserve target crucial for credit rating purposes.

**D.    The Defendants Make Inter-fund Transfers in FY 2007 and 2008
to Mask Increasing Deficits in the General Fund**

34.    In fiscal years 2007 and 2008, the City recorded certain inter-fund transfers totaling approximately $37.5 million from its Capital Projects Funds and a Special Revenue Fund to its General Fund.  Governmental GAAP stipulates that Capital Projects Funds should be used to account for financial resources to be used for the acquisition or construction of major capital facilities (National Council on Governmental Accounting ("NCGA") Statement 1). Special Revenue Funds should be used to account for specific revenue sources that are legally restricted to expenditures for specified purposes (NCGA Statement 1).

35.    In the 1990s, following the City's financial crisis, the City enacted a law that the City's General Fund reserves could not fall below 20% of its average general revenues for the prior three fiscal years.  The misleading transfers in fiscal year 2008 prevented this from occurring.

36.     At the close of fiscal year 2007, Boudreaux was concerned about the declining fund balance in the City's General Fund.  Boudreaux, therefore, proposed fund transfers to the General Fund as a way to reduce the declines in the City's General Fund balance and help the City meet its financial goal of maintaining a General Fund balance (or total reserve) of at least $100 million.  In fact, the transfers in fiscal year 2008 prevented the City's General Fund fund balance from falling below the 20% reserve requirement.

### 1.     The $13.1 Million Transfer to the General Fund in FY 2007

37.     On or about January 22, 2008, after the end of fiscal year 2007, Boudreaux notified the CFO that the General Fund ending balance for fiscal year 2007 was approximately $92.4 million and, more importantly, the projected total decline in the General Fund balance was $33.8 million.  The projected General Fund ending balance was problematic because it fell below the City's General Fund balance (or total reserve) target of $100 million for 2007.

38.      Hence, to close this gap as of the close of fiscal year 2007, a few months later Boudreaux recommended that the City transfer to its General Fund any "unused General Fund contributions sitting in" the Capital Projects Funds.  Purportedly in connection with finding unused General Funds, on or about April 28, 2008, Boudreaux gave the Finance Director a written request for a journal entry to transfer $13.1 million to the City's General Fund from one of its Capital Projects Funds.

39.     In his request to the Finance Director for the journal entry, Boudreaux claimed the Budget Department's ongoing review of the Capital Projects Funds indicated there were "unused General Fund contributions" in the Capital Projects Funds as of September 30, 2007.  Boudreaux also stated the City Manager had agreed they could return to the General Fund any unused General Fund contributions leftover in the Capital Projects Funds at the end of fiscal year 2007.

40.     When Boudreaux made these representations, he knew that part of the $13.1 million, although unspent, was still needed by certain capital projects.  Further, he had no reasonable basis to conclude the remaining portion of that amount was unused and no longer needed.  For example, the $13.1 million transfer came from money from two funding awards the General Fund had previously made to certain capital projects.  In early 2008, prior to the transfer, Boudreaux had asked the City's former Assistant Director of Capital Improvement Projects ("Assistant CIP Director") to research the projects to which the General Fund dollars were allocated and the projects' unspent balances.  In March 2008, the City's Assistant CIP Director provided Boudreaux her analysis showing only about $900,000 out of approximately $5.1 million was in fact unused and no longer needed for future expenditures for ongoing projects.

41.     Boudreaux disregarded her analysis and did not request further information or analysis about the other relevant capital projects funded from the second award from the General Fund.  Instead, he left the approximate $900,000 not needed in the Capital Projects Funds and requested the transfer of $13.1 million (comprised of the additional $4.2 million from the award the Assistant CIP Director had analyzed plus $8.9 million from the second award) to the General Fund.  This money was still needed for capital projects.

42.     The City ultimately recorded the $13.1 million transfer in a post-closing journal entry (manually recorded subsequent to the closing of the City's books for the month of September 30, 2007).  This transfer resulted in a 34% reduction of the deficit (or decrease in the General Fund's balance) in fiscal year 2007, thereby resulting in a 15% increase in the General Fund ending balance.  As a result, the City was able to meet its General Fund balance target of $100 million, reporting a fund balance of approximately $100.5 million in its 2007 CAFR.

43.     Although $13.1 million was transferred from the Capital Projects Fund, the budgets for the affected capital projects were not adjusted as they should have been to remove the funding from the projects.  In fact, the Budget Department did not request that the City Commission remove the funding from the City's budget for the affected capital projects.  Nor did the City replace the transferred funds with funds from other eligible capital funding sources.  Consequently, the affected capital projects began to incur unfunded expenditures.

44.     On May 8, 2008, as part of the process to close-out the City's 2007 Operating Budget, Boudreaux presented the 2007 year end budget resolution that included the $13.1 million transfer to the City Commission for approval.  During this public City Commission meeting, Boudreaux falsely described the $13.1 million as "unallocated" General Fund money that was being moved back to the General Fund from the Capital Projects Funds.  During prior briefings with individual Commissioners, Boudreaux also falsely described the funds as "unused."  At the time, Boudreaux knew this money consisted of funds that had been previously allocated to specific ongoing capital projects that still needed this money.

45.     At the public City Commission meeting, Boudreaux highlighted the fact that the City's General Fund would close 2007 with a balance of slightly more than the $100 million target number.  The City Commission then approved Boudreaux's budget amendment, including the $13.1 million transfer, and closed out the City's fiscal year 2007 Operating Budget.

46.     When the City Commission closed out the City's 2007 Budget, it adopted a resolution that only authorized the transfer of "any excess unrestricted moneys from other funds to the General Fund provided that those are appropriated moneys which are no longer needed to implement the original purpose of the appropriation and whose expenditure is not limited to use for any other specified purpose."  The $13.1 million transfer was contrary to this resolution

because it involved the transfer of money still needed to implement the original purpose of the appropriation, whose expenditure was not limited to use for any other specified purpose, and did not involve "excess" funds.

47.     As discussed more fully below, the City's 2007 CAFR contained material misrepresentations and omissions concerning the $13.1 million transfer, including omitting to disclose the full amount and effect of this transfer on the General Fund's balance and that the transfer was comprised of funds that were allocated to specific capital projects that still needed the money as of the fiscal year end.

### 2.     $24.4 Million in Transfers to the General Fund in FY 2008

48.     During fiscal year 2008, the City recorded a series of transfers totaling approximately $24.4 million from the Capital Projects Funds and a Special Revenue Fund to its General Fund.  As with the $13.1 million transfer in 2007, the purpose of these transfers was to reduce the decline in the General Fund balance and maintain a General Fund balance target of $100 million.  Indeed, had the City not made the transfers in 2008, its General Fund balance would have fallen below the 20% reserve requirement and, thus, the City would have been in violation of City law.  Notably, the transfers in 2008 resulted in a 78% reduction of the deficit (or decrease in the General Fund's balance) in fiscal year 2008 and a 35% increase in its ending balance.

### a.   The $3.1 Million Transfer of Restricted Downtown Development Fees

49.     In October 2008, Boudreaux orchestrated a $3.1 million transfer to the City's General Fund from a Special Revenue Fund the City used to account for the proceeds of revenue sources legally restricted to expenditures relating to specific City economic development and planning purposes.  The $3.1 million transferred to the General Fund consisted entirely of

restricted downtown development supplemental fees (fees charged to new developments within downtown Miami pursuant to City Code).

50.     On October 21, 2008, Boudreaux caused this transfer to take place by sending an email to the Finance Department requesting adjustments to the City's fiscal year 2008 operating transfers.  An attachment to his email falsely described the $3.1 million transfer as providing for "indirect costs" incurred in the General Fund relating to downtown development.  Further, Boudreaux did not provide the Finance Department with any supporting documentation for this transfer.  Nonetheless, the Finance Department recorded the $3.1 million transfer to the General Fund in a journal entry dated as of September 30, 2008, and the City Commission ultimately approved this transfer as part of the total budget adjustments Boudreaux proposed for fiscal year 2008.

51.     Boudreaux's justification for this $3.1 million transfer was false.  The City had not incurred any indirect costs in the General Fund relating to downtown development.  This money consisted of restricted downtown development supplemental fees which the City Code required to be held in a separate account. In addition, Boudreaux failed to provide any legitimate documentation to support this transfer.

52.     In 2010, after the start of the Commission's investigation of this matter, the City performed a reconciliation of all of its Special Revenue Funds and could not find justification or supporting documentation for this $3.1 million transfer.  As with all the transfers Boudreaux orchestrated, the only purpose for transferring these restricted funds to the General Fund was to help stem the decrease in the General Fund balance.  Significantly, in 2010, the City determined this transfer was improper and sent $3.1 million back to the Special Revenue Fund from the General Fund.

**b.  The $8 Million Transfer of Capital Projects Funds**

53.     In November 2008, Boudreaux orchestrated a transfer of $8 million of Capital Projects Funds to the General Fund.  In connection with this transfer, Boudreaux instructed the City's Budget Coordinator to send an email to the Finance Department requesting an $8 million transfer from the Capital Projects Funds to the General Fund.  An attachment to the email, which the Budget Coordinator prepared at Boudreaux's instruction, falsely described the $8 million transfer as the return of an "advanced allocation" the General Fund had previously made to the Capital Projects Funds.  Again, Boudreaux did not provide any supporting documentation for this transfer.  Yet, the City posted the $8 million transfer to the General Fund in a journal entry dated as of September 30, 2008.

54.     As with the transfer discussed above, Boudreaux's justification for the $8 million was false.  In late December 2009, the Assistant CIP Director analyzed this and other questionable transfers from the Capital Projects Funds to the General Fund during 2008.  Her analysis showed there was never any "advanced allocation" of the $8 million from the General Fund.  Her analysis also showed the $8 million consisted of almost all of the money in two revenue accounts within the Capital Projects Funds as of the end of fiscal year 2008.  It further revealed that a number of capital projects had already incurred expenditures totaling approximately $8 million against these accounts during fiscal years 2007 and 2008.  In fact, the funds in the two revenue accounts should have been applied to the corresponding capital projects where the expenditures took place instead of being transferred to the General Fund.

55.     In early 2009, Boudreaux consulted with his staff and the CIP Department about the propriety of this very same transfer.  On March 26, 2009 (the same day the City issued its 2008 CAFR), the Finance Director raised concerns about the 2007 and 2008 transfers and

18

Boudreaux requested that the City's CIP Budget Administrator and the Assistant CIP Director analyze the accounts from where the $8 million was transferred.  The next day, the Assistant CIP Director gave Boudreaux a detailed chart showing the projects these accounts supported had already incurred expenditures totaling approximately $8 million in fiscal years 2007 and 2008.

56.     On or about April 14, 2009, Boudreaux emailed the Assistant CIP Director and the City's CIP Budget Administrator that the City would have to transfer funds back to the Capital Projects Funds in fiscal year 2009 to cover shortfalls in these capital projects.

### c.  The $13.3 Million Transfers of Restricted Impact and Storm Water Utility Fees

57.     Despite the two transfers discussed above, in December 2008, Boudreaux sent the Finance Director an email stating the total projected General Fund ending balance for fiscal year 2008 was approximately $91.2 million and that the projected decrease to the General Fund balance was about $9.2 million.  These projections showed the City was again expecting to fall below its General Fund balance target of $100 million.

58.     Approximately two months later, in February 2009, Boudreaux contacted the Finance Director about a proposal to make five transfers totaling approximately $20.1 million from three different Capital Projects Funds to the General Fund.  Like the 2007 $13.1 million transfer, Boudreaux proposed including all five transfers in a post-closing journal entry in fiscal year 2008.

59.     The first proposed transfer for approximately $6.8 million involved moving purported "unused" General Fund contributions from the Capital Projects Funds back to the General Fund.

60.     The second proposed transfer for approximately $8.2 million involved moving purported "unused" General Fund contributions that had been made to capital projects back to

the General Fund and "replacing" the funds with restricted impact fees from the City's Impact Fee Fund.

61.     Similarly, the three remaining transfers totaling about $5.1 million also involved "replacing" purported "unused" contributions the General Fund had allegedly provided to three specific storm sewer projects with the remaining balance in a revenue account held in the City's Storm Sewer Fund.

62.     City Code designates the impact fees and storm water utility fees as restricted, and requires they not be commingled with other funds or revenues of the City.  Pursuant to City Code, developers pay impact fees at the time of building permit issuance to fund capital improvements needed to address demand for public facilities attributable to new developments. Storm water utility fees are required to be used exclusively by the City's Public Works Department to pay for capital improvements to, and maintenance or operation of, the City's storm drainage and sewer system.

63.     After Boudreaux advised the Finance Director of his proposal, the Finance Director told him she was concerned about the proposed transfers from a budgetary standpoint because they were only a temporary solution to offset the decrease in the General Fund balance and would delay action to resolve the problems causing the City to have to use its General Fund reserves in the first place.  She also told Boudreaux she planned to discuss the proposal with the CFO.

64.     Shortly thereafter, on February 26, 2009, the City Manager met with the CFO, Finance Director, Boudreaux, and the City's Treasurer to discuss Boudreaux's proposed transfers.  The Finance Director again voiced her concerns about the transfers.  She also told the group that although $13.1 million had been transferred to the General Fund in fiscal year 2007,

the capital projects for which these funds had been set aside had continued to incur expenditures because the budgets were never adjusted.  Furthermore, she questioned whether the funds Boudreaux proposed to transfer to the General Fund in fiscal year 2008 would still be needed to pay for ongoing capital project expenditures in the future.

65.     Above all, the Finance Director remarked that transferring these funds to the General Fund would be a "shell game" if they were later returned to the Capital Projects Funds to cover expenses incurred by the affected projects.  Even the Treasurer, who had worked at the City during its financial crisis in the 1990s, described Boudreaux's proposed transfers as reminiscent of the questionable fiscal policy that had led to the City's financial meltdown in the 1990s.

66.     Boudreaux's five proposed transfers totaling $20.1 million would have almost completely eliminated the decrease in the General Fund balance for fiscal year 2008 and would have resulted in an almost zero net change to the General Fund balance for that year.  The Finance Director and the Treasurer both believed that it was unreasonable and unrealistic to show this General Fund balance given the severity of the economic downturn at the time.  Besides that, the Finance Director, and the Treasurer also strongly objected to Boudreaux's proposed transfer of the $6.8 million because, unlike the other four proposed transfers, it did not involve "replacing" unused General Fund contributions made to capital projects with other funds.

67.     Boudreaux later decided to exclude the $6.8 million transfer from the final proposal, leaving the four remaining transfers totaling approximately $13.3 million.

68.     Significantly, had Boudreaux included the first proposed transfer of $6.8 million, the City would have again just met its $100 million General Fund balance target for 2008.

69.     On March 12, 2009, the City Commission approved the $13.3 million transfer following a brief presentation by Boudreaux at a Commission meeting to close out the City's fiscal year 2008 Operating Budget.  As in the previous year, during briefings with individual City Commissioners, Boudreaux falsely described the $13.3 million as "unused" General Fund dollars that were being returned to the General Fund.  At the City Commission meeting, the Commission Chair actually commented on the relative health of the City's General Fund balance.

70.     As in the prior year, in closing out the City's 2008 budget, the City Commission adopted a resolution that only authorized the transfer of "any excess unrestricted moneys from other funds to the General Fund provided that those are appropriated moneys which are no longer needed to implement the original purpose of the appropriation and whose expenditure is not limited to use for any other specified purpose."  The 2008 transfers were contrary to this City's resolution because they involved the transfer of money still needed to implement the original purpose of the appropriation and whose expenditure was not limited to use for any other specified purpose.  The transfers also did not involve "excess" funds, and some of the transfers included restricted funds.

71.     The next day, Boudreaux gave the Finance Director a written request, with including supporting documentation, for a journal entry to make the four transfers totaling $13.3 million from the Capital Projects Funds to the General Fund.  Boudreaux's request stated these were "unused" General Fund contributions being sent back to the General Fund.

72.     The City Manager approved the $13.3 million transfers based on Boudreaux's misrepresentation that the funds being transferred back to the General Fund were unused General Fund contributions.

73.     However, as further discussed above, $8.2 million of the money transferred to the General Fund consisted of restricted impact fees rather than unused General Fund contributions. Furthermore, these restricted impact fees had already been allocated to specific eligible capital projects and were not available at the time of the transfer to the General Fund.  In fact, specific capital projects had already spent $2.7 million of these funds.

74.     Furthermore, the $8.2 million in restricted impact fees was actually recorded and transferred to the General Fund directly from the Impact Fee Fund, a fund specifically created to segregate and maintain these restricted fees.  This transfer was recorded based on the journal entry that Boudreaux provided to Finance Director.

75.     The remaining $5.1 million transferred to the General Fund from the three storm sewer projects also did not consist of unused contributions from the General Fund.  In fact, the three storm sewer projects in question never received General Fund contributions in the first place.  Instead, the storm sewer projects received restricted storm water utility fees.

76.     Furthermore, the storm water utility fees collected by the City had been accounted for in the General Fund, contrary to City Code that required the City to collect and account for these restricted fees in a Special Revenue Fund.  Strangely enough, the City had a Storm Water Utility Special Revenue Fund, a fund specifically created to account for these restricted fees, but had not used this Special Revenue Fund since 2002, which was a violation of City law.

77.     In short, the $5.1 million transferred to the General Fund in 2008 from these three storm sewer projects consisted of restricted storm water utility fees.  Furthermore, contrary to Boudreaux's representations, the revenue account did not have the available funds to "replace" the $5.1 million that was sent to the General Fund because the money held in that account was already earmarked for other ongoing capital projects.

### E.    The Transfers had a Material Impact on the City's General Fund

78.    The transfers in 2007 and 2008 materially impacted the General Fund.  The following chart sets forth the General Fund's ending balances as reported in fiscal years 2007 and 2008 and the impact that the 2007 and 2008 transfers had on the General Fund's balances for those years:

### GENERAL FUND

| As Reported for General Fund: | 9/30/2007 | 9/30/2008 |
|---|---|---|
| Change in Fund Balance (Deficit) **Including** Transfers In | ($25,806,369) | ($6,872,696) |
| Ending Fund Balance **Including** Transfers In | **$100,450,144** | **$93,577,448** |
| **Impact of the Transfers In to General Fund:** | | |
| Transfers In | **$13,101,442** | **$24,365,095** |
| Change in Fund Balance (Deficit) **Excluding** Transfers In | ($38,907,811) | ($31,237,791) |
| Ending Fund Balance **Excluding** Transfers In | **$87,348,702** | **$69,212,353** |
| **General Fund Reserve Requirement:** | $81,260,684 | $89,250,880 |

79.    The $13.1 million transfer in fiscal year 2007 resulted in a 34% reduction of the deficit (or decrease in the General Fund's balance) from $38.9 million to $25.8 million in fiscal year 2007, thereby resulting in a 15% increase of the General Fund ending balance from $87.4 million to $100.5 million.  Thus, the City met its General Fund balance target of $100 million, reporting a balance of approximately $100.5 million in its 2007 CAFR.

80.    Similarly, the $24.4 million in transfers in fiscal year 2008 resulted in a 78% reduction of the deficit (or decrease in the General Fund's balance) from $31.2 million to $6.8

million in fiscal year 2008, and a 35% increase of its ending balance from $69.2 million to $93.6 million.

81.     If the City had not transferred the $24.4 million in 2008, its General Fund balance would have fallen below the 20% reserve required by law, and the City Commission would have been required by law to adopt a plan to replenish the reserves back to the required threshold within two fiscal years.

82.     The impact of the transfers on the General Fund and their obfuscation of the City's failing finances were not lost on the Finance Director and others in senior management at the City.  In a March 2009 email to Boudreaux, the City Manager, the CFO, the Treasurer, and the Assistant City Manager, the Finance Director documented her concerns that the transfers would "mask the complete loss" sustained by the General Fund during fiscal year 2008.  To underscore the seriousness of her concerns, the Finance Director wrote:

> As originally stated at the [February 26, 2009] meeting, I do not believe it is fiscally prudent or financially responsible to mask the loss in the General Fund for FY 2008 with these journals.  I believe that the position of the City in today's economic times should be one of conservatism.  Returning the funds to the General Fund is a 'one-time' solution that does not address the issues that caused the deficit to begin with; it is also reminiscent of the practices of the 1990's which led to financial crisis.  Without showing the full loss (i.e., losses prior to the entry), I believe the urgency of the elected officials to make changes and address the causes of said deficits will be diffused.

83.     Although, the Finance Director also questioned whether the $13.1 million transfer in 2007 actually consisted of unused General Fund contributions as Boudreaux previously claimed, the City Manager ultimately authorized the $13.3 million transfer in 2008.  The City Manager did so, because Boudreaux had repeatedly falsely assured him and others that the funds were unused General Fund contributions that could properly be returned to the General Fund.

25

**F.     Misrepresentations and Omissions in the City's Public Disclosure Documents Concerning its General Fund and the Transfers**

**1.   The 2007 CAFR**

84.     The City made material misrepresentations and omissions in its 2007 CAFR concerning the $13.1 million transfer.  Specifically, the MD&A section of the City's 2007 CAFR contain two vague references to the 2007 transfer and its impact on the General Fund.  In drafting the misleading disclosures, the City used and relied on information Boudreaux provided. The numbers for the charts regarding the transfers included in the 2007 CAFR were provided by Boudreaux.  Boudreaux also proposed the 2007 transfer and made the journal request.

85.     First, the "General Fund Budgetary Highlights" section of the MD&A stated that "[n]on-Departmental experienced a positive variance against the budget of $7,282,947 as a result of contributions from the Capital Improvement Fund not expended in fiscal year 2007, returned to the General Fund."

86.     Second, the "Financial Analysis of the City's Funds" section of the MD&A contained the following statement:

> The General Fund's fund balance decreased by $25,806,369 during the current fiscal year.  Key factors in this decrease are: … net effect of various inflows and outflows during the fiscal year.

87.     These statements were misleading and omitted material facts because they did not disclose the full amount or effect of the $13.1 million transfer to the General Fund's budget and its fund balance.  Nor did they disclose the fact that the fiscal year 2007 transfer included funds that although not expended, were allocated to specific capital projects that still needed those funds.  The disclosures also omitted the fact that the budget for Capital Projects Funds had not been adjusted to show that $13.1 million had been transferred out of the Capital Projects Funds.

88. Furthermore, the disclosures did not comport with Governmental GAAP (Government Accounting Standards Board "GASB" (Statement 34, par. 11(d)), which states that the MD&A should provide an analysis of "significant changes in fund balances" and "whether restrictions, commitments, or other limitations significantly affect the availability of fund resources for future use." Indeed, the MD&A section of the City's 2007 CAFR omitted any analysis of the change to the General Fund balance resulting from the $13.1 million transfer or disclosure of the fact that this money was already allocated to capital projects that still needed the funds.

89. The City's disclosures in its 2007 financial statements were also deficient. For instance, the City included in its 2007 CAFR a boilerplate footnote to its financial statements entitled "Inter-fund Receivables, Payables, and Transfers" that also omitted material facts. Although the $13.1 million transfer was listed in a chart included in this footnote, the footnote was void of any description or details about the transfer or its impact on the General Fund.

90. Above all, the footnote omitted certain information required by Governmental GAAP (GASB Statement 38, par. 15), which provides that governments should disclose in the notes to the financial statements, among other details, the intended purpose and the amount of significant transfers that meet either or both of the following criteria: (i) do not occur on a routine basis and/or (ii) are inconsistent with the activities of the fund making the transfer – for example, a transfer from a capital projects fund to the General Fund. The footnote omitted disclosure of the intended purpose of the $13.1 million transfer, namely, to offset the decline in the General Fund balance and to maintain a General Fund balance target of $100 million.

### 2.   The 2008 CAFR and 2009 Official Statements

91.     The City's 2008 CAFR also contained material misrepresentations and omissions concerning the $24.4 million transfer to the General Fund in fiscal year 2008.  In drafting the misleading disclosures, the City used and relied on information Boudreaux provided.

92.     In the "Financial Analysis of the City's Funds" section of the MD&A, the City made the following false and misleading statement about $21.3 million of the $24.4 million transferred to the General Fund in fiscal year 2008 (the difference being the $3.1 million transfer of downtown Miami development fees):

> The General Fund's fund balance had a net decrease of $6,872,696 during the current fiscal year. The decrease in the General Fund's fund balance was off-set by approximately $21.3 million of transfers from the capital projects funds which were unused appropriations that were initially funded from the general fund in prior years.

93.     The "General Fund Budgetary Highlights" section of MD&A contained a similar description of the transfers.  These statements were false and misleading.  As discussed more fully above, $8.2 million transferred from the Capital Projects Funds were restricted impact fees rather than "unused appropriations that were initially funded" from the General Fund.  Another $5.1 million transferred from the Capital Projects Funds were never funded with General Fund contributions, but rather with restricted storm water utility fees.  Moreover, another $8 million transferred from the Capital Projects Funds did not originate from the General Fund but instead from two revenue accounts within the Capital Projects Funds.  This $8 million amount was also in fact not "unused" because the money was already spent by capital projects at the time of the transfer to the General Fund.

94.     These disclosures also omitted the fact that the General Fund's balance was further increased by the improper $3.1 million transfer of restricted downtown development

supplemental fees, as discussed more fully above.  Finally, the City omitted to disclose that capital projects impacted by the fiscal year 2007 transfer continued after the funding was removed to incur unfunded expenditures and deficits.

95.    For the same reasons discussed above, the boilerplate footnote to the City's 2008 financial statements did not comply with GASB Statement 38, and was otherwise misleading and omitted material facts about the inter-fund transfers in fiscal year 2008.

96.    The Official Statements for the May, July, and December 2009 bond offerings contained materially false and misleading statements and omissions because they included the MD&A section of the City's 2008 CAFR.

97.    Additionally, the Official Statement for the July 2009 bond offering omitted to disclose in a "Management Discussion and Budget Finances" section that certain capital projects impacted by prior year transfers continued to incur unfunded expenditures and deficits, and that the City expected that the General Fund would have to transfer funds to the Capital Projects Funds to offset these project deficits.

98.    In addition, the City's fiscal year 2008 financial statements and the 2008 CAFR, which were contained in the Official Statements, were also materially misstated because of the transfer of the restricted money to the General Fund.  In particular, the City's General Fund financial statements were misstated because of the transfers of the $3.1 million restricted downtown development fees, $8.2 million restricted impact fees, and $5.1 million restricted storm water utility fees, to the General Fund.  These transfers of restricted fees to the General Fund totaling $16.4 million resulted in an overstatement of transfers in to the General Fund of 27% (from $60.4 million to $76.8 million), a reduction of the deficit in the General Fund of 70% (from $23.2 million to $6.8 million), and an overstatement of the General Fund ending fund

balance of 21% (from $77.2 million to $93.6 million) in the City's fiscal year 2008 General Fund financial statements.

99.     Furthermore, pursuant to Governmental GAAP, these legally restricted funds should have been properly accounted for separately from the General Fund in the other respective funds established by the City for those designated purposes.

100.    Specifically, Governmental GAAP (NCGA Statement 1) states the diverse nature of governmental operations and the necessity of assuring legal compliance preclude recording and summarizing all governmental financial transactions and balances in a single accounting entity.  It furthermore states that unlike a private business, a governmental unit is accounted for through several separate fund entities each having a separate set of accounts and functioning independently.

101.    Finally, Governmental GAAP (GASB Statement 34) also provides that governments should report governmental funds in their fund financial statements to the extent they have activities that meet the criteria for using those funds.  Therefore, under GAAP, the $3.1 million restricted downtown development fees should have been accounted for in the City's Special Revenue Fund.  Similarly, the $8.2 million restricted impact fees should have been accounted for in the City's Impact Fee Capital Projects Fund.  And, the $5.1 million restricted storm water utility fees should have been accounted for in the City's Storm Sewer Capital Projects Fund.

**G.     Misrepresentations to the Rating Agencies by the Defendants**

102.    Boudreaux and the City made material misrepresentations and omissions to Standard and Poor's, Moody's, and Fitch, the rating agencies that rated the City's 2009 bonds. In a slide presentation to the rating agencies during the last week of April 2009, Boudreaux

represented the City was projecting an operating deficit of only $15.6 million in the General Fund for fiscal year 2009.  This statement was false and misleading because it omitted to disclose that the City would have to transfer money from the General Fund back to the Capital Projects Funds in 2009 to cover shortfalls in capital projects resulting from transfers that were made in fiscal years 2007 and 2008.

103.    Boudreaux made additional materially false and misleading statements to Moody's when he sent an email to Moody's stating that "[t]he reason for the increase in transfers in FY 2008 was due to the return of prior year General Fund contributions from the Capital Fund."  This email, which Boudreaux sent in response to a question from Moody's, was false and misleading because these funds never originated from the General Fund.  Furthermore, Boudreaux omitted to disclose in this email that the funds transferred in fiscal year 2008 included dollars restricted by City Code for designated purposes, and consisted of money taken from specific capital projects that had already incurred expenditures against those funds or still needed them.

**H.    Details of the Transfers are Revealed and Funds are Sent Back From the General Fund to Capital Projects and Special Revenue Funds**

104.    In November 2009, after conducting its annual review of the City's compliance with its Financial Integrity Principles adopted as law following its last fiscal crisis in the 1990s, the City's Office of Independent Auditor General ("OIAG") issued a report in which it made several findings concerning (a) the $13.1 million transferred from the Capital Projects Funds in fiscal year 2007; and (b) the $13.3 million transfers relating to the impact fees and storm sewer projects transferred from the Capital Projects Funds in fiscal year 2008.

105.    For example, the OIAG found that management's representation to the City Commission that the funds taken from the Capital Projects Funds were "unused" General Fund

contributions was inaccurate and misleading because there were already large shortages in capital project funding. The OIAG also determined that the $8.2 million transferred from the Impact Fee Fund to the General Fund in 2008 consisted of restricted impact fees and not General Fund contributions. The OIAG concluded that these transfers were used to increase the General Fund balance reserves and noted they resulted in a 15% and 16.5% increase in the General Fund balance reserves for fiscal years 2007 and 2008, respectively

106. In March 2010, during the preparation of the City's 2009 CAFR, the City transferred approximately $17.2 million from the General Fund back to its Capital Projects Funds to fund the shortfall in the Capital Projects Funds. This amount included the shortfall resulting from the $13.1 million transferred in fiscal year 2007 and the $8 million transferred in fiscal year 2008.

107. Additionally, the City reversed the $8.2 million transfer of the impact fees and returned the fees from the General Fund back to the Capital Projects Funds. These transfers totaling $25.4 million decreased the General Fund balance by 27% in fiscal year 2009. They were reflected in the City's 2009 CAFR, issued in April 2010 and described in that CAFR as money transferred from the General Fund to the Capital Projects Funds "to cover capital project expenditures which continued to spend after funding had been removed." Finally, in November 2010, the City determined the $3.1 million transfer of restricted downtown development fees was also improper. During the preparation of its 2010 CAFR, the City transferred this money back from the General Fund to the Special Revenue Fund.

108. In June and July 2010, about three months after the City issued its 2009 CAFR disclosing the transfers back to the Capital Projects Funds, Standard and Poor's, Moody's, and Fitch all lowered their ratings on the City's general obligation bonds and issued a negative

ratings outlook.  In addition, S&P downgraded the City's May 2009 and July 2009 bonds and Fitch downgraded the May 2009 bonds.  All three ratings agencies cited the deteriorating condition of the City's General Fund as a major reason for the ratings downgrade.

109.   More importantly, the rating agencies each reported that the reversals from the General Fund back to the Capital Projects Funds contributed to the deteriorating condition of the City's General Fund.  For example, Standard and Poor's reported the following in its June 2010 ratings downgrade:

> The city, which is currently subject to an SEC inquiry over the use of capital funds and impact fees, had transferred $28.3 million in capital funds over two years that it did not expect to use for capital projects to balance its 2007 and 2008 budgets.  Although the funds were transferred to the general fund to close the budget gap, the city still incurred capital expenditures associated with the projects for which these funds were originally budgeted, leaving the capital funds with a $20 million dollar funding shortfall.  In fiscal 2009, management decided to reverse the $28.3 million transfer, re-establishing the funds to the capital fund and increasing the general fund's operating deficit by that amount.  The city's total general fund balance declined from $93.57 million to $39.97 million.

110.   In June 2011, Standard and Poor's once again lowered its ratings on the City's bonds, stating the downgrade was based on its view of the "continued pressure on the city's finances as evidenced by continuing operating deficits, structurally unbalanced budgets, and low reserves."  According to Standard and Poor's, the outlook on the City's bonds remains negative.

111.   Through the misconduct discussed in this Complaint, the City, acting through Boudreaux and others, obtained property and money.  For example, the City obtained investors' money and deprived investors of a property interest by having them pay money in exchange for the City's bonds.

I.       **Boudreaux's Integral Role in the Fraud**

112.   Boudreaux was the architect of the scheme to defraud.  First, he devised all the transfers discussed above, including the transfers of restricted funds to the General Fund.  Second, between 2008 and 2009, he misrepresented the true nature of the $13.1 million and $13.3 million transfers to City Commission during public meetings, in briefings with individual City Commissions and their staff, to the City's external auditors, and to others in senior management at the City.   Third, he falsified the justification of the $8 million and $3.1 million transfers in the city's internal records.   Fourth, he made false representations to third parties, such as the rating agencies.  Finally, during the audit of the City's 2008 financial statements, Boudreaux continued to misrepresent the true nature of the $13.1 million transfer in 2007, even after he was challenged by others at the City about the transfer.  At the time Boudreaux engaged in this scheme to defraud he knew his misconduct would lead to false and misleading disclosures about the General Fund and adversely affect the City's financial statements relied on by purchasers of the City's previously-issued debt and new debt.

113.   Moreover, Boudreaux furnished information that was materially false and misleading that was incorporated into the City's filings.   For example, he supplied budget information, including the closeout budget, which he knew would be relied on in preparing the CAFRs.

114.   By no later than January 31, 2008, Boudreaux took on the additional responsibilities of assisting the Capital Improvement Department in preparing overall capital budget and updates to the Multi-Year Capital Plan, including a comprehensive review of allocation needs and status of capital projects, providing fiscal monitoring of capital budgets to

include determination of funds availability, and monitoring actual expenditures to ensure they did not exceed budget appropriations.

115.    Boudreaux devised the transfer proposals knowing the relationship of the General Fund balance to favorable ratings for the City.  In a revenue manual, he wrote, "Fiscal year 2006 is the last audited year and fiscal years 2007 and [2008] are anticipated to maintain the City's general fund balance above 100 million.  As a result of this responsible fiscal management it has an opportunity to see positive bond ratings on City issued debt with favorable interest rates." Boudreaux devised the transfers discussed above for the purpose of helping the City obtain positive bond ratings in furtherance of a scheme to defraud investors in the City's bonds.

## V.    CLAIMS FOR RELIEF

### COUNT I

### Fraud in Violation of Section 17(a)(1) of the Securities Act
**(Against the City and Boudreaux)**

116.    The Commission repeats and realleges paragraphs 1 through 115 of this complaint as if fully restated herein.

117.    From no later than 2007 through 2009, the Defendants directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, as described in this complaint, knowingly, willfully or recklessly employed devices, schemes or artifices to defraud.

118.    By reason of the foregoing, the Defendants have directly or indirectly violated and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT II

### Fraud in Violation of Sections 17(a)(2) and (3) of the Securities Act
**(Against the City and Boudreaux)**

119.    The Commission repeats and realleages paragraphs 1 through 115 of this complaint as if fully restated herein.

120.    From no later than 2007 through 2009, the Defendants directly and indirectly, by use of the means of instruments of transportation or communication in interstate commerce and by the use of the mails, in the offer or sale of securities, as described in this complaint: (a) obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (b) engaged in transactions, practices and courses of business which operated or would operate as a fraud or deceit upon the purchaser.

121.    By reason of the foregoing, the Defendants have directly or indirectly violated and, unless enjoined, are reasonably likely to continue to violate, Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2) and 77q(a) (3).

## COUNT III

### Fraud in Violation of Section 10(b) of the Exchange Act and Rule 10b-5
**(Against the City and Boudreaux)**

122.    The Commission repeats and realleges paragraphs 1 through 115 of this complaint as if fully restated herein.

123.    From no later than 2007 through 2009, the Defendants directly and indirectly, by use of the means and instruments of interstate commerce, and of the mails in connection with the purchase or sale of securities, as described in this complaint, knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the

36

light of the circumstances under which they were made, not misleading, and/or (c) engaged in acts, practices and courses of business which have operated as a fraud upon the purchasers of such securities.

124. By reason of the foregoing, the Defendants have directly or indirectly violated and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

## COUNT IV

### Aiding and Abetting the City's Violation of Section 10(b) of the Exchange Act and Rule 10b-5
**(Against Boudreaux)**

125. The Commission repeats and realleges paragraphs 1 through 115 of the complaint as if fully restated herein.

126. From no later than 2007 through 2009, the City directly and indirectly, by use of the means and instruments of interstate commerce, and of the mails in connection with the purchase or sale of securities, as described in this complaint, knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and/or (c) engaged in acts, practices and courses of business which have operated as a fraud upon the purchasers of such securities in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

127. Boudreaux, directly and indirectly, from at least 2008 through 2009, aided and abetted the City's violation of Section 10(b) of the Exchange Act and Rule 10b-5.

128.    By reason of the foregoing, Boudreaux directly or indirectly violated, and unless restrained and enjoined is reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## COUNT V

### Violations of Commission Cease and Desist Order
### (Against the City)

129.    The Commission repeats and realleges paragraphs 1 through 115 of this complaint as if fully restated herein.

130.    On March 21, 2003, the Commission ordered that the City of Miami cease and desist from causing any violations of the antifraud provisions of the securities laws.  In the Matter of the City of Miami, Florida, Securities Act Release No. 8213, Exchange Act Release No. 47552, Administrative Proceeding File No. 3-10022 (March 21, 2003).

131.    By reason of the foregoing, the City has violated, and unless ordered to comply will violate, the Commission's March 21, 2003 order.  Accordingly, the Court should issue an order pursuant to Section 20(c) of the Securities Act and Section 21(e) of the Exchange Act commanding the City to comply with the prior Commission Order.

### RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

### Declaratory Relief

Declare, determine, and find that the City and Boudreaux committed the violations of the federal securities laws alleged herein.

## II.

## Order

Issue an order pursuant to Section 20(c) of the Securities Act and Section 21(e) of the Exchange Act commanding the City to comply with the prior Commission Order.

## III.

## Permanent Injunction

Issue a Permanent Injunction, enjoining the City and Boudreaux, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a) and Section 10(b)  and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b).

## IV.

## Penalties

Issue an Order directing the City and Boudreaux to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d); and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

## V.

## Further Relief

Grant such other and further relief as may be necessary and appropriate.

## VI.

## Retention of Jurisdiction

Further, the Commission respectfully requests the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may hereby be

entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Respectfully submitted,

July 19, 2013

By: s/: Christopher E. Martin
    Christopher E. Martin, Esq.
    Senior Trial Counsel
    S.D. Fla. Bar No. A5500747
    Direct Dial:  (305) 982-6386
    E-mail: martinc@sec.gov

    Amie Riggle Berlin
    Senior Trial Counsel
    Fla. Bar No. 630020
    Direct Dial:  (305) 982-6322
    E-mail: berlina@sec.gov

    Andre J. Zamorano, Esq.
    Senior Counsel
    Florida Bar Number 967361
    Direct Dial:  (305) 982-6324
    E-mail: Zamoranoa@sec.gov

    Rachel K. Paulose
    Senior Counsel
    S.D. Fla. Bar No. A5501315
    Direct Dial:  (305) 982-6318
    E-mail: pauloser@sec.gov

    Attorneys for Plaintiff
    **U.S. Securities and Exchange Commission**
    801 Brickell Avenue, Suite 1800
    Miami, Florida 33131
    Telephone:  (305) 982-6300
    Facsimile:    (305) 536-4154