**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.  13-22600-CIV-ALTONAGA**

**SECURITIES AND EXCHANGE**
**COMMISSION**,

       Plaintiff,

v.

**CITY OF MIAMI, FLORIDA**, *et al.*,

       Defendants.

_____/

## ORDER

THIS CAUSE came before the Court on Defendant, City of Miami's ("City['s]") Motion to Dismiss . . . ("Motion") [ECF No. 28], filed October 7, 2013.  Plaintiff, Securities and Exchange Commission ("Commission" or the "SEC"), filed a Response . . . ("Response") [ECF No. 43], on November 8, 2013, and the City filed its Reply . . . ("Reply") [ECF No. 49], on November 25, 2013.  The Court has carefully reviewed the parties' written submissions and applicable law.

## I.      BACKGROUND

Introduction.  In March 2003, the Commission issued a cease-and-desist order against the City for violating the anti-fraud provisions of the federal securities laws in connection with the City's issuance of bonds in 1995.  (*See* Compl. ¶ 2 [ECF No. 1]).  In this action, the Commission alleges the City has violated the same securities laws again, this time in connection with three bonds issued by the City in 2009.  (*See id.* ¶ 2).  The Commission's 40-page, 131-paragraph Complaint narrating the City's and Defendant Michael Boudreaux's ("Boudreaux['s]") actions and omissions with specific and detailed allegations is the subject of the present Motion.

The City regularly issues municipal bonds to the public, and at the end of its most recent fiscal year ending September 30, 2012, it had outstanding municipal bonds totaling approximately $647 million.  (*See id.* ¶ 10).  Boudreaux was the City's Budget Director during the relevant time periods, until his termination in March 2010.  (*See id.* ¶ 11).  The Budget Department is responsible for the preparation and presentation of the City's budgets for its general operating, capital projects, special revenue, and debt service funds.  (*See id.*).  Boudreaux was responsible for preparing the overall capital budgets and monitoring expenditures to ensure they did not exceed budget appropriations, and he masterminded the transfers at issue, which were incorporated into the financial information included in the City's Management Discussion and Analysis ("MD&A") and financial statements.  (*See id.*).  He supplied journal entries budget information, including the closeout budgets that he knew would be relied on in preparing the City's Comprehensive Annual Financial Reports ("CAFRs").[1]  (*See id.* ¶¶ 11, 113).

The following is a condensed version of the story told in the Complaint.  The City's General Fund, used to account for all financial resources except those required to be reported in other funds, is the largest component of the City's consolidated operating budget.  (*See id.* ¶¶ 18–19).  During fiscal years 2007 through 2010, the City reported decreasing General Fund balances[2] due to overspending, revenue underperformance, and declines in property taxes.  (*See id.* ¶ 20).

The 2009 Bond Offerings.  On May 29, 2009, the City issued $51 million in uninsured Limited Ad Valorem Tax Bonds.  (*See id.* ¶ 24).  On July 16, 2009, the City issued $37 million in uninsured Non Ad Valorem Revenue Refunding Taxable Pension Bonds. (*See id.* ¶ 27).  On December 2, 2009, the City issued $65 million in uninsured Special Obligation Bonds, secured

---

[1] A CAFR is a government entity's official annual report.  (*See* Compl. ¶ 21).

[2] Fund balances refer to the difference between fund assets and liabilities.  (*See id.* ¶ 18).

by pledges of certain local gas and transportation taxes and parking surcharges.  (*See id.* ¶ 28). The Preliminary Official Statement and Official Statements for these bond offerings contained excerpts of the City's 2008 CAFR, including the MD&A section and fiscal year-end 2008 audited financial statements.  (*See id.* ¶¶ 24, 27–28).  The bond closing documents contained certificates stating the Official Statement was free of misstatements and omissions of material fact (the "Anti-Fraud Certifications").  (*See id.*).

The rating agencies, Standard and Poor's Financial Services LLC ("Standard and Poor's"), Moody's Investors Service, Inc. ("Moody's"), and Fitch Ratings Ltd. ("Fitch"), gave the three bond offerings favorable ratings.  (*See id.* ¶¶ 25, 27–28).  Credit ratings are important because they affect the cost of borrowing; the City as an issuer can save or incur significant additional costs in interest over the life of a bond because of its credit rating.  (*See id.* ¶ 26). Issuers with good ratings are able to borrow at low cost as they pay low interest rates.  (*See id.*).

The 2007 CAFR.  Earlier, on July 22, 2008, the City had distributed its 2007 CAFR to the investing public.  (*See id.* ¶ 21).  The 2007 CAFR contained misleading disclosures regarding a $13.1 million transfer from the Capital Improvement Fund to the General Fund.  (*See id.* ¶ 38). The City had used and relied upon information provided by Boudreaux, such as the numbers for the charts regarding the transfers included in the 2007 CAFR.  (*See id.* ¶¶ 38, 84).  The MD&A section of the 2007 CAFR misleadingly claimed the City was returning contributions from the Capital Improvement Fund to the General Fund because they were not expended, when in truth they had been allocated to specific capital projects that still needed those funds.  (*See id.* ¶¶ 85– 87).  The disclosures did not comport with governmental generally accepted accounting principles ("Governmental GAAP") pursuant to Government Accounting Standards Board ("GASB") Statement 34.  (*See id.* ¶ 88 (citing GASB, Stmt. No. 34, *Basic Fin. Stmts. — &*

*Mgmt.'s Discuss'n & Anal. — for St. & Local Gov'ts*, ¶ 11(d) (June 1999))).[3]  The disclosures in the 2007 financial statements were also deficient because the footnote describing the transfer omitted information required by Governmental GAAP (*see* GASB, Stmt. No. 38, *Certain Fin. Stmt. Note Disclosures* ¶ 15 (June 2001)), as it failed to disclose the intended purpose of the $31.1 million transfer was to offset the decline in the General Fund balance and maintain a General Fund balance target of $100 million.  (*See* Compl. ¶¶ 42, 89–90).

When Defendants made the $13.1 million transfer, they knew the Capital Improvement Fund still needed a significant portion of the $13.1 million.  (*See id.* ¶¶ 40–41).  This transfer was material because it reduced the City's deficit for fiscal year 2007 by 34 percent and increased the General Fund's ending balance by 15 percent, enabling the City to meet its General Fund balance of $100 million and to report its fund balance of $100.5 million in its 2007 CAFR. (*See id.* ¶ 79).

The 2008 CAFR.  On March 26, 2009, the City distributed its 2008 CAFR to the investing public, including in it material misrepresentations and omissions concerning more than $24 million of transfers to the General Fund.  (*See id.* ¶¶ 22, 91–92).  Again, in drafting these misleading disclosures, the City relied on information provided by Boudreaux, which was later included in the May, July, and December 2009 bond offerings.  (*See id.* ¶ 96).  The information was false and misleading because $8.2 million transferred from the Capital Projects Funds were restricted impact fees rather than "unused appropriations that were initially funded" from the General Fund.  (*Id.* ¶¶ 92–93) (citation omitted).  Specific capital projects had already spent $2.7 million of these funds.  (*See id.* ¶¶ 73–74).

---

[3]  The full text of GASB statements can be accessed through GASB's website at: http://www.gasb.org/jsp/GASB/Page/GASBSectionPage&cid=1176160042391#gasbs50.

Another $5.1 million transferred from the Capital Project Funds were never funded with General Fund unused contributions, but with restricted storm water utility fees.  (*See id.* ¶¶ 75, 77).  And contrary to Boudreaux's representations, the revenue account did not have available funds to "replace" the $5.1 million sent to the General Fund because the money held in that account was already earmarked for other ongoing capital projects.  (*See id.* ¶¶ 76–77).

Another $8 million transferred from the Capital Projects Funds did not originate from the General Fund but instead from two revenue accounts within the Capital Projects Funds; this money was not "unused" as it was already spent by capital projects by the time of the transfer to the General Fund.  (*See id.* ¶ 54). Boudreaux falsely described the $8 million transfer as the return of an "advanced allocation" the General Fund had made to the Capital Projects Funds, and provided no supporting documentation for the transfer.  (*See id.* ¶ 53).  The $8 million consisted of almost all the money in two revenue accounts within the Capital Projects Funds, and a number of capital projects had already incurred expenditures totaling approximately $8 million against these accounts.  (*See id.* ¶¶ 54–55).

The disclosures also omitted the fact that the General Fund's balance was further increased by an improper $3.1 million transfer of restricted downtown development supplemental fees.  (*See id.* ¶ 94).  Boudreaux's justification for the $3.1 million transfer — that the transfer provided for "indirect costs" incurred in the General Fund relating to downtown development  — was false, and the City Code required the restricted downtown development supplemental fees be held in a separate account.  (*See id.* ¶¶ 50–51).  Indeed, in 2010, after the Commission's investigation into this matter, the City determined the transfer was improper and sent $3.1 million back to the Special Revenue Fund from the General Fund.  (*See id.* ¶ 52).

CASE NO.  13-22600-CIV-ALTONAGA

The City omitted to disclose that capital projects impacted by the fiscal year 2007 transfer continued to incur unfunded expenditures and deficits after the funding was removed.  (*See id.* ¶¶ 94–95).  And $16.4 million of the transfers to the General Fund came from restricted fees.  (*See id.* ¶ 98).  Pursuant to Governmental GAAP, the City was prohibited from placing the restricted funds in the General Fund.  (*See id.* ¶¶ 98–101).

In the 1990s following a financial crisis in the City, the City enacted a law that the City's General Fund reserves could not fall below 20 percent of its average general revenues for the prior three fiscal years.  (*See id.* ¶ 35).  The 2008 transfers materially impacted the General Fund, resulting in a 78 percent reduction of the 2008 fiscal year deficit and a 35 percent increase in the General Fund's ending balance.  (*See id.* ¶ 48).  The transfers of restricted fees to the General Fund totaling $16.4 million resulted in an overstatement of transfers to the General Fund of 27 percent, a reduction of the deficit in the General Fund of 70 percent, and an overstatement of the General Fund ending balance of 21 percent.  (*See id.* ¶ 98).  If the City had not transferred the $24.4 million in 2008, the General Fund balance would have fallen below the 20 percent reserve mandated by law and the City Commission would have been required to adopt a plan to replenish the reserves to the requisite threshold within two fiscal years.  (*See id.* ¶ 81).

Boudreaux is Warned About the Transfers.  The City's Finance Director told Boudreaux she was concerned about the proposed transfers because they were a temporary solution to offset the decrease in the General Fund balance and would delay action to resolve the problems causing the City to use its General Fund reserves in the first place.  (*See id.* ¶ 63).  On February 26, 2009, the Finance Director again voiced her concerns in a meeting with the City Manager, the Chief Financial Officer, Boudreaux, and the City Treasurer.  (*See id.* ¶ 64).  The Finance Director remarked that transferring the funds to the General Fund would be a "shell game" if they were

later returned to the Capital Projects Funds to cover expenses incurred by the affected projects. (*See id.* ¶ 65; *see also id.* ¶ 82).  The Treasurer also described Boudreaux's proposed transfer as reminiscent of the questionable fiscal policy that had led to the City's financial meltdown in the 1990s.  (*See id.* ¶ 65).

Defendants' Misrepresentations and Omissions to the Rating Agencies.  Defendants made material misrepresentations and omissions to Standard and Poor's, Moody's, and Fitch — the rating agencies that rated the City's 2009 bonds.  (*See id.* ¶ 102).  During the last week of April 2009, Boudreaux represented to the rating agencies that the City was projecting an operating deficit of only $15.6 million in the General Fund for fiscal year 2009.  (*See id.*).  This was false and misleading, as it did not disclose the City would have to transfer money from the General Fund back to the Capital Projects Funds in 2009 to cover shortfalls in capital projects from transfers made in fiscal years 2007 and 2008.  (*See id.*).  Boudreaux also made false statements to Moody's when he sent it an email stating "[t]he reason for the increase in transfers in FY 2008 was due to the return of prior year General Fund contributions from the Capital Fund."  (*Id.* ¶ 103).  The statement was false, as the funds never originated from the General Fund and Boudreaux never disclosed the funds transferred in fiscal year 2008 included dollars restricted by the City Code for designated purposes and taken from specific capital projects that had already incurred expenditures against those funds or still needed them.  (*See id.*).

Details of the Transfers are Revealed, and Funds are Returned.  In November 2009, the City's Office of Independent Auditor General ("OIAG") issued a report with findings concerning the $13.1 million transferred from the Capital Projects Funds in fiscal year 2007 and the $13.3 million in transfers relating to the impact fees and storm sewer projects transferred from the Capital Projects Funds in fiscal year 2008.  (*See id.* ¶ 104).  The OIAG found the City's

management's representation to the City Commission that the funds taken from the Capital Projects Funds were "unused" General Fund contributions was inaccurate and misleading because there were already large shortages in capital project funding.  (*See id.* ¶ 105).  The OIAG determined the $8.2 million transferred from the Impact Fee Fund to the General Fund in 2008 consisted of restricted impact fees and not General Fund contributions.  (*See id.*).  The OIAG concluded the City used these transfers to increase the General Fund balance reserves by 15 percent and 16.5 percent for 2007 and 2008, respectively.  (*See id.*).

In March 2010, the City transferred $17.2 million from the General Fund back to the Capital Projects Funds to fund the shortfall in the Capital Projects Funds.  (*See id.* ¶ 106).  This amount included the shortfall resulting from the $13.1 million transferred in fiscal year 2007 and the $8 million transferred in fiscal year 2008.  (*See id.*).  The City also reversed the $8.2 million transfer of the impact fees and returned the fees from the General Fund back to the Capital Projects Funds.  (*See id.* ¶ 107).  These transfers totaling $25.4 million decreased the General Fund balance by 27 percent in fiscal year 2009.  (*See id.*).  These transfers were required "to cover capital project expenditures which continued to spend after funding had been removed." (*Id.*).  In November 2010, the City determined the $3.1 million transfer of restricted downtown development fees was also improper and later transferred the money from the General Fund back to the Special Revenue Fund.  (*See id.*).

In June and July 2010, after the City issued its 2009 CAFR disclosing the transfers back to the Capital Projects Funds, the rating agencies lowered their ratings on the City's general obligations bonds and issued a negative ratings outlook.  (*See id.* ¶ 108).  The City's May 2009 and July 2009 bonds were downgraded.  (*See id.*).  The rating agencies each reported the reversals from the General Fund back to the Capital Projects Funds contributed to the

deteriorating condition of the City's General Fund.  (*See id.* ¶ 109).  In June 2011, Standard and Poor's once again lowered its ratings on the City's bonds, stating the downgrade was based on its view of the "continued pressure on the city's finances as evidenced by continuing operating deficits, structurally unbalanced budgets, and low reserves."  (*Id.* ¶ 110).

<u>Defendants' Scheme</u>.  Defendants carried out a scheme to defraud, and Boudreaux was its architect.  (*See id.* ¶ 112).  Boudreaux devised all the transfers, including the transfers of restricted funds to the General Fund.  (*See id.*).  Between 2008 and 2009 Boudreaux misrepresented the true nature of the $13.1 million and $13.3 million transfers to the City Commission during public meetings, in briefings with City Commissioners and their staff, to the City's external auditors, and to other senior managers of the City.  (*See id.*).  Boudreaux falsified the justification for the $8 million and $3.1 million transfers in the City's internal records.  (*See id.*).  Boudreaux made false representations to third parties, such as the rating agencies.  (*See id.*).  During the audit of the City's 2008 financial statements, Boudreaux continued to misrepresent the true nature of the $13.1 million transfer in 2007, even after he was challenged by others at the City about the transfer.  (*See id.*).  Boudreaux knew his misconduct would lead to false and misleading disclosures about the General Fund and adversely affect the City's financial statements relied on by purchasers of the City's previously-issued debt and new debt.  (*See id.*).

Boudreaux furnished materially false and misleading information that was incorporated into the City's filings.  (*See id.* ¶ 113).  He supplied budget information, including the closeout budget, which he knew would be relied on in preparing the CAFRs.  (*See id.*).  Boudreaux devised the transfer proposals knowing the relationship between the General Fund balance and favorable ratings.  (*See id.* ¶ 115).  Tellingly, Boudreaux wrote in a revenue manual, "Fiscal year 2006 is the last audited year and fiscal years 2007 and [2008] are anticipated to maintain the

City's general fund balance above 100 million.  As a result of this responsible fiscal management it has an opportunity to see positive bond ratings on City issued debt with favorable interest rates."  (*Id.*).  Boudreaux devised the transfers for the purpose of helping the City obtain positive bond ratings in furtherance of a scheme to defraud bond investors.  (*See id.* ¶ 115).

Claims for Relief.  On the basis of these and other allegations not repeated here, the Commission states five claims for relief.  Count I, titled "Fraud in Violation of Section 17(a)(1) of the Securities Act," 15 U.S.C. section 77q(a), alleges between 2007 and 2009, Defendants used the means or instruments of transportation or communication in interstate commerce, and by use of the mails offered and sold securities knowingly, willfully or recklessly employing schemes or artifices to defraud.  (*See id.* ¶¶ 117–18).  Count II, titled "Fraud in Violation of Sections 17(a)(2) and (3) of the Securities Act," alleges between 2007 and 2009, Defendants, by use of the means of instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities: (a) obtained money or property by means of untrue statements of material facts and omissions of material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (b) engaged in transactions, practices and courses of business which operated or would operate as a fraud or deceit upon the purchaser.  (*See id.* ¶ 120).  In Count III, titled "Fraud in Violation of Section 10(b) of the Exchange Act [15 U.S.C. section 78j(b),] and Rule 10b-5," 17 C.F.R. section 240.10b-5, the Commission alleges from 2007 through 2009 Defendants by use of the means and instruments of interstate commerce and the mails in connection with the purchase or sale of securities, knowingly, willfully, or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under

which they were made, not misleading; and/or (c) engaged in acts, practices, and courses of business which have operated as a fraud upon the purchasers of the securities.  (*See id.* ¶¶ 123–24).  Count IV against Boudreaux is titled "Aiding and Abetting the City's Violation of Section 10(b) of the Exchange Act and Rule 10b-5," and it alleges Boudreaux aided and abetted the City in (a) employing devices, schemes or artifices to defraud; (b) in making untrue statements of material facts and omitting to state material facts; and/or (c) engaging in acts, practices, and courses of business that have operated as a fraud upon the purchasers of such securities.  (*See id.* ¶ 126).  Last, Count V against the City, titled "Violations of Cease and Desist Order," alleges the City violated the Commission's March 21, 2003 order to cease and desist from causing any violations of the antifraud provisions of the securities laws, and seeks an order pursuant to Section 20(c) of the Securities Act and Section 21(e) of the Exchange Act commanding the City to comply with a prior Commission order.  (*See id.* ¶¶ 130–31).

The Commission seeks a declaration that Defendants have violated the federal securities laws (*see id.* 38); an order directing the City to comply with the prior Commission order (*see id.* 39); a permanent injunction enjoining Defendants from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a) and Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) (*see id.*); and an order directing Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d) (*see id.*).

## II.    STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although

this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555).   Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).   To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true.  *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

While complaints are adequate if they contain "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2), where a complaint states securities fraud claims, as with other types of fraud claims, the complaint must also satisfy the heightened pleading requirements of Rule 9(b), stating "with particularity the circumstances constituting fraud." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008); *see also Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 789 (11th Cir. 2010) (citations omitted).  And Rule 9(b) is satisfied where the complaint states:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Mizzaro*, 544 F.3d at 1237 (quoting *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007)).

"[U]nder Rule 9(b), it is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." *Id.* The purpose for this degree of particularity is to "alert[] defendants to the precise misconduct with which they are charged and protect[] defendants against spurious charges of immoral and fraudulent behavior." *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (citations and internal quotation marks omitted). In addressing whether Rule 9(b) requires nonfraud securities claims to be pled with particularity, the Eleventh Circuit has sided with the majority of circuits in holding that "Rule 9(b) applies when the misrepresentation justifying relief under the Securities Act is also alleged to support a claim for fraud under the Exchange Act and Rule 10(b)-5." *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277 (11th Cir. 2006) (citations and footnote call number omitted). Further, Rule 9(b) applies to claims of aiding and abetting securities violations when the same fraud-related factual allegations underlying the aiding-and-abetting claims also support the fraud claims. *See SEC v. Levin*, No. 12-21917-CIV, 2013 WL 594736, at *6 (S.D. Fla. Feb. 14, 2013) (citation omitted).

### III.  DISCUSSION

The City seeks a dismissal of all of the counts of the Complaint directed to it. It first argues the Complaint fails to plead any false or misleading statement in that: it fails to connect the factual allegations to the claims stated; no claims can be based on the 2007 CAFR; and the 2008 CAFR identified the amount, purpose, and source of the transfers. Second, the City argues the Complaint fails to plead materiality as to any of the challenged statements because: no misstatement could be material to the December 2009 offering; none of the information allegedly omitted from the 2007 and 2008 CAFRs was material to any bond offering; and the rating

agencies' decisions do not establish materiality.  Third, the City asserts the Complaint fails to plead *scienter* as to the section 10(b) and section 17(a)(1) claims against the City and Boudreaux. Fourth, the City states the claims under section 17(a)(2) or 17(a)(3) fail because the SEC has failed to plead negligence.  Fifth, the City argues no allegations support the claim the City violated the earlier cease and desist order.  Last, the City asserts no claim for civil penalties may be stated against a municipality.   These arguments are addressed in the sequence presented.

### A.        Whether the Complaint Alleges a False or Misleading Statement

To plead a violation of section 17(a)(1), as stated in Count I, the Complaint must allege "(1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with scienter."  *SEC v. Merch. Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007) (citation omitted).  For Count II to properly state a violation of sections 17(a)(2) and 17(a)(3), the SEC must allege "(1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with negligence." *Id.*   (citation omitted).  And for Count III alleging a violation of section 10(b) and Rule 10b-5, the SEC must allege: "(1) a material misrepresentation or omission; (2) scienter . . . ; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss." *Meyer v. Greene*, 710 F.3d 1189, 1194 (11th Cir. 2013) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005) (internal quotation marks and footnote call number omitted)).

The City's first attack upon the Complaint is that the SEC fails to plead any false or misleading statement to support these first three claims.  The City generally complains the pleading fails to connect the factual allegations to each of the claims, relying in large part on

*Wagner*, 464 F.3d 1273, a case involving claims brought under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b),[4] where the Eleventh Circuit required re-pleading of a "proverbial shotgun pleading" "that incorporate[ed] every antecedent allegation by reference into each subsequent claim for relief."  (citation omitted).  The City also insists the 2007 CAFR was not incorporated into any of the offering documents, and in any event, the 2007 and 2008 CAFRs provided all information regarding the rationale for the transfers complained about, so no misrepresentations can be found there.  (*See* Mot. 9–15; Reply 4–6).

Regarding the City's reliance on *Wagner*, 464 F.3d 1273, to urge a dismissal of the Complaint in its entirety, the Court is not convinced the Complaint is a shotgun pleading.  Each count does not incorporate every preceding allegation, including paragraphs of other counts, but rather each count incorporates only the general allegations contained in paragraphs 1 through 115.  Those general allegations support each claim for relief and identify the relevant events, misrepresentations, and omissions advanced by the SEC.  Neither the Court nor Defendants have to sift through the allegations to see which ones support the cause of action purportedly stated and disregard allegations that only pertain to other counts, such as would be the case if each count incorporated allegations of the preceding count or counts.  *See, e.g., U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1354, n.6 (11th Cir. 2006) (describing a typical shotgun pleading as one where "Count Two incorporated Count One and adds six paragraphs."); *Edward v. BAC Home Loans Servicing, L.P.*, No. 12-15487, 2013 U.S. App. WL 4400102, at *3 (11th Cir. Aug. 16, 2013) ("An example of a shotgun pleading is a pleading that incorporates every antecedent allegation by reference into each subsequent claim for relief." (citation omitted)).  Here, the

---

[4] Where a private litigant brings a section 10(b) claim, "it is subject to the PLSRA, under which a plaintiff must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 633 (11th Cir. 2010) (citation and internal quotation marks omitted).

allegations of each count in the Complaint do not incorporate by reference every antecedent allegation, as the allegations specifically applicable to a count are not thereafter incorporated into the subsequent count.  *Cf. SEC v. Solow*, No. 06-81041-CIV-MIDDLEBROOKS/JOHNSON, 2007 U.S. Dist. WL 917269, at *3 (S.D. Fla. Mar. 23, 2007) (The court applied the rationale of *Wagner* where only the fact section was reincorporated with each count).  The Court sees no difficulty in reviewing the sufficiency of each count of the SEC's Complaint by considering the allegations stated in paragraphs 1 through 115, all of which the SEC intends to have support each count by its incorporation thereto.

Furthermore, as noted by the SEC in its Response and the court in *SEC v. Das*, No. 8:10CV102, 2010 WL 4615336, at *6 (D. Neb. Nov. 4, 2010), the present Complaint does not include hundreds of paragraphs, as was the case in *Wagner*, nor does it involve numerous defendants or voluminous documents.  (*See* Resp. 27).  The instant case has two defendants, a municipal employer and its employee, and a few false documents.  "The factual allegations are relatively brief and clear, and a more detailed statement of how those facts apply to each claim is not necessary to enable the [two] Defendants to respond to the allegations."  *Das*, 2010 WL 4615336, at *6 (alteration added).

The Court acknowledges that in *Levin*, 2013 WL 594736, at *7–8, the court applied *Wagner*, 464 F.3d at 1278–79, and followed *Solow*, 2007 WL 917269 at *3, to conclude that the SEC's wholesale incorporation of forty-nine paragraphs into each of six counts in the complaint, with no other facts supporting the counts apart from the general factual background section of the pleading, and while technically not a shotgun pleading, failed to satisfy Rule 9(b).  The court in *Levin*, however, pointed out particular examples of uncertainty regarding which facts from the factual background section supported each claim for relief, and which facts pertained to the two

named defendants.  *Levin*, 2013 WL 594736, at *8 (stating, for example, the complaint "does not specify whether the Banyon or BIF misstatements and omissions, or both, are the basis for the fraud allegations in Counts II and III against both Levin and Preve.").  Here, all of the facts of the background section are intended to contain the two Defendants' misstatements and omissions complained about and which form the basis of each of the claims for relief.  The City has pointed out no uncertainties regarding how to interpret those facts, or which facts apply to which Defendant, other than its contentions regarding the inadequacy of the facts, including the 2007 and 2008 CAFRs, to support the SEC's claims.  The Court sees no other way to address the City's concerns short of having the SEC re-plead, to repeat verbatim, the incorporated paragraphs into each of the six counts.  But the Court will not have the SEC go through such an inefficient exercise, nor have the parties re-brief and the Court reconsider the matters addressed in the present briefing.  *See Levin*, 2013 WL 594736, at *9 (where the court declined to address the remaining arguments regarding the sufficiency of the pleadings' allegations concerning materiality and *scienter* until after amendment).  Doing so would only add further delay and expense to the case.

        With regard to the false statements purportedly made, the Complaint alleges the following.  The 2007 CAFR stated funds being transferred were "not expended" when in reality the funds were still needed to complete ongoing projects.  The 2008 CAFR, excerpts of which were included with the Preliminary Official Statement and Official Statements for the bond offerings, stated the transfers to the City's General Fund were unused appropriations initially funded from the General Fund in prior years when in truth the funds were not "unused appropriations," the funds were not initially funded from the General Fund in prior years, and most of the funds should not have been transferred because they were restricted funds.  The 2008

CAFR misstated the balance by overstating the General Fund balance as the City was including restricted funds that could not have been properly included in the balance.  And statements made to rating agencies in presentations regarding the City's 2009 budget were false, as the budget did not include funds the General Fund would need to transfer back in 2009 to cover shortfalls created by the 2007–08 transfers.  "A duty to disclose may [] be created by a defendant's previous decision to speak voluntarily.  Where a defendant's failure to speak would render the defendant's *own* prior speech misleading or deceptive, a duty to disclose arises." *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1043 (11th Cir. 1986) (alteration added; emphasis in original; citation omitted).  The Complaint alleges once the City made these specific representations, whether required to by law or not, the City failed to comply with its duty under the federal securities laws to ensure its representations were materially accurate and did not omit material information.

Regarding the falsity of the noted statements, the City argues it clearly identified the amount and nature of the transfers, provided all the information regarding the rationale for those transfers, and disclosed the City was spending more money than it was taking in.  (*See* Reply, 4).  But that is not what the Complaint alleges the City did.  The City asserts the SEC fails to state why the money at issue could not be deferred for a period of time as the City reevaluated the timing of capital projects during a global financial crisis, and is critical of the SEC for failing to offer authority to that effect.  (*See id.* 4–5).  But the Court is unaware of any authority, and the City cites to none, that requires the SEC to address these "defenses" the City is interposing in a motion to dismiss in order to state valid claims for relief predicated on the falsity of the identified statements.  The City also states the SEC fails to allege when the transferred funds were needed, and the SEC lacks authority to supersede the City Commission's determination

regarding its projects and funding of a multi-year capital plan.   Yet that is not what the Complaint purports to do; it merely challenges, for example, the truthfulness of representations contained in the 2008 CAFR provided to bond investors under the federal securities law.

The City's next contention is that it is unclear what claims, if any, can be based on the 2007 CAFR, as the document was not incorporated into any of the bond offerings at issue.  (*See* Mot. 12; Reply 6–7).   While the City accuses the SEC of failing to address this argument in its Response (*see* Reply 6), the SEC does clarify the relevance of the 2007 CAFR to the present claims.   The SEC explains that while not included in the 2009 bond offerings, the 2007 CAFR was publicly disseminated containing materially false information, and so collectively it changed the information available to investors holding the City's outstanding bonds.   (*See* Resp. 25). This public dissemination, argues the SEC, satisfies the "in connection" with the purchase or sale of any security required under Section 10(b) and Rule 10b-5 of the Exchange Act.  (*See id.* 25– 26 (quoting *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993) (If the material misrepresentation or omission occurred in the context of "public dissemination in a document such as a press release, annual report, investment prospectus or other such document on which an investor would presumably rely, the 'in connection with' requirement is generally met by proof of the means of dissemination and the materiality of the misrepresentation or omission.") (citation omitted)).   Whether the false statements contained in the 2007 CAFR serve to support the federal securities claims or are merely provided as background information preceding the discussion of the falsity of the information later contained in the 2008 CAFR, the allegations concerning the 2007 CAFR do not compel a dismissal for the failure of the Complaint to state claims of securities violations.

As to the City's assertion that it did disclose the information the SEC maintains was not

properly disclosed in the 2008 CAFR, the SEC's theory, supported by the well-pleaded facts, is that reasonable investors would have no way of knowing certain, relevant information about the funds being transferred: that the funds were already used or expended; that the funds included restricted funds the City could not transfer into the General Fund; or that the funds included funds not initially from the General Fund.  (*See* Response 18).  In this sense, this case is different from *Benzon v. Morgan Stanley Distributors, Inc.*, 420 F.3d 598, 609 (6th Cir. 2005), a case the City relies on (*see* Mot. 14), where a prospectus contained all information necessary to compare different shares of classes.  While the City recasts the Complaint as the SEC believing the City should have stated more explicitly "it was transferring money to improve the General Fund's balance" (Mot. 14.), this is not what the SEC complains of when it addresses the transfer of expended or restricted funds not disclosed as such in the information the City disseminated.  And while the City is certainly entitled to its belief that readers of the 2008 CAFR "knew precisely what the City was doing and why it was doing it" (*id.* at 15), again, that is not what the Complaint alleges, nor what the Court must accept as true for purposes of deciding whether the Complaint satisfies Rule 9(b).  As to the City's first line of attack concerning the lack of allegations concerning false statements, the Court finds the Complaint satisfies the who, what, when, where, and why of Rule 9(b).

## B.  Whether the Complaint Pleads Materiality

The City's next chief criticism of the Complaint is that it fails to plead any material misrepresentation or omission.  "[A]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."  *Basic, Inc. v. Levinson*, 485 U.S. 224, 231 (1988) (citation and internal quotation marks omitted).  More particularly, "to fulfill the materiality requirement 'there must be a substantial likelihood that the

disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Id.* at 231–32. (citation omitted). "Nevertheless, to be material, a fact need not be outcome-determinative — that is, it need not be important enough that it would necessarily cause a reasonable investor to change his investment decision." *SEC v. Meltzer*, 440 F. Supp. 2d 179, 190 (E.D.N.Y. 2006) (citation omitted). A court should not dismiss a complaint on the ground that statements or omissions are immaterial, "unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (citations and internal quotation marks omitted). Where the statements or omissions are so obviously unimportant, the court may "rule that the allegations are inactionable as a matter of law" and dismiss a complaint, notwithstanding materiality being a mixed question of law and fact usually decided by the trier of fact. *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 369, n.13 (3d Cir. 1993) (citations omitted).

The City argues the 2008 CAFR clearly identified the amounts, sources, and purposes of the transfers, showing the City was merely transferring money between its own accounts. (*See* Mot. 15). According to the City, there is no allegation "the City had a duty to disclose the purportedly omitted facts or provide more information" (*id.* at 16), and there is no allegation there was any impact on the bonds or that any investor considered the misrepresentations or omissions in purchasing or not purchasing bonds. (*See id. at* 16–17). The City is critical of the absence of any allegation concerning whether the City was authorized or not to transfer the funds at issue. (*See id.* at 17). On the basis of these and other criticisms, the City concludes "[t]he SEC's allegations regarding the transfers and certifications in the Complaint are, if anything, nothing more than obviously unimportant considerations of a reasonable investor." (*Id.* at 17).

CASE NO.  13-22600-CIV-ALTONAGA

The City gives more examples of the absence of materiality.  For example, the Complaint alleges the 2009 bond offerings were secured by gas and transportation taxes and parking surcharges; as they were not secured by the General Fund, any misstatements or omissions about the Fund were immaterial.  (*See id.* at 18).  The Inspector General's November 2009 report critical of the 2007 and 2008 transfers, issued before the December 2009 bond offering, was available to investors, rating agencies, and the general public.  (*See id.* at 18 (citing *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978) ("[W]here information is equally available to both parties, a defendant should not be held liable to the plaintiff under securities laws for failure to disclose." (citations omitted))).  Further, by reading the 2008 CAFR, investors would know the City was spending more money than it was taking in and the General Fund was below the $100 million number even with substantial transfers.  (*See* Mot. 19–20).   And while the Complaint alleges the 2008 CAFR was misleading because it did not disclose some of the funds (approximately $8 million) came from restricted sources of revenue, and although an investor may have wanted to know this information, the City is critical of the SEC's failure to allege this fact would likely have changed an investment decision.  (*See id.* 20).

Last, the City presents an argument seeking to dismiss the significance of the rating agencies' initially favorable ratings of the 2009 bonds based on the 2008 CAFR.  By examining the rating agencies' written documentation, attached to the Motion as exhibits that may be considered without converting the Motion to one for summary judgment (*see Universal Express, Inc. v. SEC*, 177 F. App'x 52, 53 (11th Cir. 2006)), the City insists the Court will see the rating agencies followed a "more sophisticated, nuanced, and holistic view of the City's finances," not dependent on "any particular amount being placed in the General Fund."  (Mot. 21).  According to the City, "[t]hese public statements by the rating agencies confirm that they understood

22

precisely the situation with Miami's revenues and precisely what the transfers did and did not do. They confirm that any additional information was immaterial." (*Id.* 22–23). Hence, the City argues the very documents the SEC relies on do not support the allegation that the downgrades occurred once the rating agencies learned the truth about the General Fund. (*Id.* 23).

The SEC insists it has met its "light burden" of alleging materiality. (*See* Resp. 19). The undersigned agrees materiality is satisfied. There is just enough in the Complaint to prevent the Court from finding the information "so unimportant that reasonable minds could not differ" as to its materiality. Certainly the City presents good arguments about the lack of materiality of the omissions in the 2007 CAFR. But the SEC makes the point that Boudreaux's manipulations in fiscal year 2008, increasing the General Fund by 35 percent, enabled the City to falsely represent the City's financial condition in the 2008 CAFR and offering statements, preventing the General Fund balance from falling below the 20 percent reserve required by law. (*See id.* 20). The SEC also argues the omissions are quantitatively material because they had a greater effect than five percent. (*See id.* (citing *SEC v. Escala Group, Inc.*, 2009 U.S. Dist. WL 2365548, at *9 (S.D.N.Y. July 31, 2009) (noting a five percent threshold may provide the basis for a preliminary assumption that a matter is material)). The preliminary quantitative analysis must be paired with a qualitative analysis of factors affecting the materiality determination. *See Escala*, 2009 WL 2365548, at *9 (citation omitted). The SEC contends the omissions were qualitatively material as well because they involved improper transactions in 2008 of placing restricted funds into the General Funds. To the City's argument about the rating agencies' nuanced and informed approach to their rating decisions, the SEC repeats its allegation that once the agencies learned of the transfer of funds from the General Fund to the Capital Projects Fund for fiscal year 2009 and of the General Fund balance decrease, the bonds were downgraded. (*See* Resp. 21 (citing

Compl. ¶¶ 106–08)).

Presented in the context of a motion to dismiss, where the Court must accept the factual allegations as true and give the SEC the benefit of the inferences which may fairly be drawn from them, *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d at 369 (citation omitted), the Court will not conclude the challenged omissions are so obviously unimportant that they are immaterial as a matter of law.  Viewing the allegations concerning materiality in the light most favorable to the SEC, the Court concludes materiality is minimally satisfied.[5]

### C.     Whether the Complaint Alleges *Scienter*

One of the elements of the SEC's section 10(b) and section 17(a)(1) claims against the City is *scienter*.  *Scienter* means "a wrongful state of mind," *Meyer v. Greene*, 710 F.3d 1189, 1194 (11th Cir. 2013); it is "a mental state embracing intent to deceive, manipulate, or defraud," *SEC v. Ginsburg*, 362 F.3d 1292, 1297 (11th Cir. 2004) (citations and internal quotation marks omitted).  To establish *scienter*, the SEC may also show "severe recklessness," that is,

> highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Mizzaro*, 544 F.3d at 1238.  Circumstantial evidence may be used to support a strong inference of *scienter*.  *In re Scientific Atlanta, Inc. v. Sec. Litig.*, 754 F. Supp. 2d 1339, 1361 (N.D. Ga. 2010) (citations omitted).  Questions of materiality and *scienter* involve assessments peculiarly within the province of the trier of fact.  *See Merch. Capital, LLC*, 483 F.3d at 766 (citation omitted).  Further, the *scienter* of a corporation's officer (or in this case a City's high-ranking employee) may be imputed to the corporation itself under general agency and corporate law

---

[5] The SEC improperly alludes to sworn testimony of the rating agencies to show those agencies consider the information an important factor in determining what rating to give the City's bonds.  (*See* Resp. 21, n.21).  This information is disregarded for purposes of the Court's analysis.

principles. *See Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1288–89 (S.D. Fla. 2008).

In challenging whether the SEC has sufficiently alleged facts to support an inference of *scienter*, the City argues the Complaint at best purports to show the *scienter* of Boudreaux, a low-level employee, which cannot be imputed to the City (*see* Mot. 24–27 (citing *In re Faro Techs. Sec. Litig.*, 534 F. Supp. 2d 1248, 1262 (M.D. Fla. 2007) (holding *scienter* must be found either as to the employee making the false statements or "any other high level employee"[6])). Further, the City asserts even as to Boudreaux the Complaint fails to show *scienter* (*see* Mot. 27). The SEC disagrees on both points.

With regard to the first argument, the Complaint contains a number of allegations (*see* Compl. ¶ 11) supporting the conclusion that Budget Director Boudreaux was a high-ranking official at the City. This is the case notwithstanding organizational charts contained within the 2007 and 2008 CAFRs and referred to by the City in its Motion. Curiously, those charts (*see* Mot. Ex. 1 [ECF No. 28-1]), rather than help the City, support the SEC's position as they identify Boudreaux by name as heading the "Office of Strategic Planning, Budgeting & Performance." As such, he reported directly to the Chief of Operations who in turn reported directly to the City Manager/Chief Administrator. (*See id.*). The Court will not conclude, on a motion to dismiss, and despite any interpretation of an organizational chart to the contrary, that the City's Budget Director was not a high ranking employee capable of having his *scienter* imputed to the City.

As to the second contention, the Complaint does allege *scienter*. As previously summarized, the Complaint alleges following entry of the cease and desist order, the City,

---

[6] The court in *In re Faro*, for example, distinguishes between a corporation's "mail room clerk and the CEO with respect to the legal authority to act for or bind the corporation through actual or apparent agency." *Id.*

through its Budget Director Boudreaux, knew it was misrepresenting the true nature of the transfers to mask declines in the General Fund balance, it knew the funds transferred into the General Fund were still needed for ongoing projects, and notwithstanding this knowledge made misrepresentations to the rating agencies about the General Fund balance and omitted to disclose the transfers.  The Complaint alleges the City knew those misleading disclosures would affect the City's financial statements relied on by purchasers of City debt.  The Complaint alleges the City moved the money into the General Fund with knowledge the rating agencies would look favorably upon the overstated General Fund account balance.

Like a corporation, a city does not have state of mind of its own.  Its *scienter* is found in the acts, statements and state of mind of its agents.  *See Mizzaro*, 544 F.3d at 1254 (citations omitted).  Therefore, it is proper to attribute Boudreaux's knowledge to the City, as a court "look[s] to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like)."  *Id.*  (internal citation and quotation marks omitted).  The City points to what it describes as immaterial omissions or misstatements by a low level employee (a point the undersigned has already rejected), the insufficiency of the desire by Boudreaux to obtain favorable credit ratings for the City to constitute severe recklessness, and the lack of knowledge that his actions would result in false statements being relied on by investors, as defeating the *scienter* allegations.  In the light of the summarized allegations, the Court disagrees.  In "evaluating scienter, a court must consider the entirety of the allegations contained in the complaint and not whether any individual allegation, scrutinized in isolation, meets that standard."  *Fried v. Stiefel Labs., Inc.*, No. 11-CV-20853, 2012 U.S. Dist. WL 4364300, at *5 (S.D. Fla. June 8, 2012) (citation omitted).  A holistic review of the Complaint

satisfies the undersigned *scienter* is properly alleged.  *See also SEC v. Bankatlantic Bancorp, Inc.*, No. 12-60082, 2012 U.S. Dist. WL 1936112, at * 17 (S.D. Fla. May 29, 2012) ("While the Defendants[] argue that their disclosures as a whose undermine this inference [of extreme recklessness], the Court finds that the above-demonstrated disconnect between the general disclosures as presented and the specific misrepresentation and omissions as alleged does not support a finding of diminished scienter on the face of these allegations and disclosures.") (alteration added; emphasis deleted).

### D.        Whether the Claim for Civil Penalties Should be Dismissed

The City next argues the Court should "dismiss" the Complaint's request for civil penalties.  While the argument is better presented as a motion to strike under Federal Rule of Civil Procedure 12(f), rather than a motion to dismiss for failure to state a claim, *see, e.g., Parsons v. Okaloosa Cnty. Sch. Dist.*, No. 3:09cv254/WS/EMT, 2010 U.S. Dist. WL 1753152, at *2 (N.D. Fla. Mar. 30, 2010), under either standard the argument fails to persuade.  The federal securities laws allow the SEC to seek penalties against municipal entities.  *See* 15 U.S.C. § 78u(d)(3)(A) ("Whenever it shall appear to the Commission that any person has violated a provision of this chapter, . . . the Commission may bring an action in a United States district court to seek, and the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation.").  And "person" is defined as including "a natural person, company, government, or political subdivision, agency, or instrumentality if a government."  15 U.S.C. § 78c(a)(9).  The City nevertheless argues section 77b(a) of the Exchange Act states the definitions in the statute are to be used "unless the context otherwise requires," 15 U.S.C. § 77b(a), and because under the common law municipalities are immune from punitive damages, the prayer for such relief in the Complaint should be

CASE NO.  13-22600-CIV-ALTONAGA

"dismissed" or "stricken."  (*See* Reply 12–13).  This argument fails to persuade, as a civil penalty does not serve the same punishment goals of punitive damages, but instead is meant to provide disincentives to securities laws violations in cases brought by the SEC.  *See, e.g., SEC v. Lybrand*, 281 F. Supp. 2d 726, 729–30 (S.D.N.Y. 2003) (citations omitted).

> **E.** **Whether the Complaint Alleges Negligence or Violation of the Cease and Desist Order**

Last, the City argues the Complaint fails to allege its negligence-based claims under sections 17(a)(2) and (3).  (*See* Mot. 28).  Given that the undersigned is satisfied the SEC has properly plead *scienter*, a much higher standard than a mere failure to exercise a standard of reasonable care in a negligence-based claim, this argument, too, must fail.  And finally, the City asserts the SEC has failed to properly allege a claim of violation of the cease and desist order.  Not so.  The Complaint properly presents this claim in Count V.

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that the Motion to Dismiss **[ECF No. 28]** is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 27th day of December, 2013.

*Cecilia M. Altonaga*

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record